```
 1                 IN THE UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF ARKANSAS
 2                         CENTRAL DIVISION

 3
      UNITED STATES OF AMERICA,
 4
                         Plaintiff,     No. 4:20CR00288-DPM
 5

 6    v.

 7
      MUJERA BENJAMIN LUNG'AHO,         Monday, May 16, 2022
 8                                      Little Rock, Arkansas
                         Defendant.     9:07 a.m.
 9

10
                      TRANSCRIPT OF MOTION HEARING
11                BEFORE THE HONORABLE D.P. MARSHALL JR.,
                      UNITED STATES DISTRICT JUDGE
12

13    APPEARANCES:

14    On Behalf of the Plaintiff:

15        MS. STACY R. WILLIAMS, Assistant United States Attorney
          MR. JOHN RAY WHITE, Assistant United States Attorney
16          United States Attorney's Office
            Eastern District of Arkansas
17          Post Office Box 1229
            Little Rock, Arkansas 72203-1229
18

19    On Behalf of the Defendant:

20        MR. MICHAEL K. KAISER, Attorney at Law
            Lassiter & Cassinelli
21          300 South Spring Street, Suite 800
            Little Rock, Arkansas  72201
22

23    Defendant present

24
          Proceedings reported by machine stenography.  Transcript
25    prepared utilizing computer-aided transcription.
```

Elaine Hinson, RMR, CRR, CCR, United States Court Reporter
elaine_hinson@ared.uscourts.gov (501) 604-5155

1           P R O C E E D I N G S

2           THE COURT:  This is the United States against --

3   pardon me if I get this wrong -- Mujera Benjamin Lung'aho.  It's

4   Case No. 4:20CR288-DPM-1.

5       We're here this morning for a hearing on some issues raised

6   by Mr. Lung'aho's motion to dismiss.  I see the person that I

7   believe to be Mr. Lung'aho and Mr. Kaiser at his side.  The

8   United States is here in the persons of Ms. Williams and Mr.

9   White.  Good to see both of you; in addition, Mr. Webster and

10  Agent Hicks.  Good to have all of y'all.

11          MS. WILLIAMS:  Thank you, Your Honor.

12          THE COURT:  Counsel, I appreciate your responses to my

13  recent order asking for more details about the material facts

14  and for some additional argument on the law, and I look forward

15  to learning more about all of that this morning.

16      Let me do some preliminaries.  If you would please raise

17  your hand, sir.  Mr. Lung'aho, I need to put you under oath --

18  my deputy will -- so I can ask you some questions.

19      (Defendant sworn.)

20          THE COURT:  Good morning.

21          THE DEFENDANT:  Good morning.

22          THE COURT:  Please correct me on your name.  Am I

23  saying it correctly?

24          THE DEFENDANT:  Mujera Lung'aho.

25          THE COURT:  Lung'aho?

1          THE DEFENDANT:  Lung'aho, yes.

2          THE COURT:  Lung'aho.  All right.  Very good.  How old

3    are you, sir?

4          THE DEFENDANT:  Thirty-one.

5          THE COURT:  Where is home?

6          THE DEFENDANT:  North Little Rock, Arkansas.

7          THE COURT:  Did you grow up there?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And how far did you get in school?

10          THE DEFENDANT:  Some college.

11          THE COURT:  Where did you go to college?

12          THE DEFENDANT:  I went to Loyola University in New

13    Orleans and then came back and did some classes at Pulaski Tech.

14          THE COURT:  Understood.  So you are an educated man.

15          THE DEFENDANT:  Yes.

16          THE COURT:  Have you read the charges pending against

17    you?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Do you understand what it is the United

20    States is alleging that you did wrong?

21          THE DEFENDANT:  I do.

22          THE COURT:  Good.  Is your mind clear this morning?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Do you understand the purpose of the

25    hearing?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Are you taking any medicine, prescription

3    or over the counter, that interferes with your thinking?

4          THE DEFENDANT:  No, sir.

5          THE COURT:  Have you had any alcohol to drink in the

6    last day or two?

7          THE DEFENDANT:  No.

8          THE COURT:  How has Mr. Kaiser done as your lawyer?

9          THE DEFENDANT:  Very well.

10          THE COURT:  Are you satisfied with his work?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Has he answered your questions?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Explained things to you?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Very good.

17      Good morning, Mr. Kaiser.

18          MR. KAISER:  Good morning, Your Honor.

19          THE COURT:  How are you?

20          MR. KAISER:  I'm doing wonderful.

21          THE COURT:  Good.  Do you have any concern about the

22    clarity of Mr. Lung'aho's mind?

23          MR. KAISER:  None whatsoever, Your Honor.

24          THE COURT:  And from your perspective is the

25    lawyer-client relationship intact?

1          MR. KAISER:  Yes, Your Honor.

2          THE COURT:  Did y'all have the opportunity to visit

3     this morning before we got started?

4          MR. KAISER:  Yes, Your Honor.

5          THE COURT:  Very good.  I know it's a 2020 case, so

6     you've been working together for some time.

7          MR. KAISER:  That's correct, sir.

8          THE COURT:  Very good.  Mr. Lung'aho, I find, first,

9     that you are competent, your mind is clear, and you know why

10    we're here.  I find, second, that you are satisfied with Mr.

11    Kaiser's work as your lawyer so far in the case, so we will

12    steam on.

13       Counsel, a housekeeping matter.

14       Mr. Kaiser, let me start with you.  The spelling of your

15    client's name, do we need, in your view, to correct the

16    superseding indictment and the Court's docket?

17         MR. KAISER:  Yes, Your Honor.  There is an apostrophe

18    following the G, before the A, in the surname.

19         THE COURT:  All right.  Ms. Williams, good morning.

20         MS. WILLIAMS:  Good morning, Your Honor.

21         THE COURT:  How are you?

22         MS. WILLIAMS:  Great.

23         THE COURT:  Good.  What about this cleanup on the

24    name?

25         MS. WILLIAMS:  If they say that's the way he spells

1   it, Your Honor, I have no objection to that.  Mr. Kaiser has

2   been spelling it that way when speaking to me from the

3   beginning.

4           THE COURT:  Very good.  I'll enter an order then that

5   directs the amendment of the superseding indictment to correctly

6   spell Mr. Lung'aho's name and add that apostrophe in there.  In

7   addition, the Court's docket will be amended to reflect that.

8       All right.  Now to our more important business.  I think,

9   counsel, that we need to start, first, with the facts, the

10  evidentiary record.  I'm hopeful.  I believe the lawyers have

11  worked together some on that, so perhaps we'll be proceeding by

12  stipulation.  But tell me where we are, first, on the facts.

13      Mr. Kaiser.

14          MR. KAISER:  Your Honor, I do have two stipulated

15  exhibits regarding the Arkansas State Police.  And then the

16  United States and myself have stipulated to the amounts of

17  funding received from the federal government and the overall

18  annual budgets listed in both of our briefs filed this past

19  week.

20          THE COURT:  Okay.

21          MR. KAISER:  If I may approach with these two exhibits

22  regarding the state police, I can read the stipulated amounts

23  into the record.

24          THE COURT:  Good.

25          MR. KAISER:  Your Honor, we've got a 2020 annual

1    report from the Arkansas State Police showing annual

2    expenditures in 2020 of $123,475,266.80.  Then we have a

3    spreadsheet regarding state police, Arkansas State Police,

4    grants from the federal government that were open during the

5    calendar year 2020, several dating back to '19, '18 and '17.

6    And that total was just under 10 million, 9,997,424.42.  If I

7    may approach with those exhibits.

8            THE COURT:  You may.  I think you said 1918 and 1917?

9    2018 and 2017?

10           MR. KAISER:  I'm sorry, Your Honor.  2017, '18 and '19

11   as well as the year 2021.

12           THE COURT:  Got it.  So we're almost at $10 million in

13   federal grants out of a total budget of 123 million plus.

14           MR. KAISER:  Well, no, Your Honor.  As the Court will

15   see in the stipulated exhibits, several of those grants go for a

16   period of years, not just one year.  So, when prorated, by my

17   calculation, it's just over 2 percent of that annual

18   $123,475,000 budget.

19           THE COURT:  Got it.  All right.  That's on the state

20   police.

21       Any objection to Defendant's 1 and 2, Ms. Williams?

22           MS. WILLIAMS:  No, Your Honor.

23           THE COURT:  They will be received.  Then, counsel, I

24   also noted the filing of these annual reports about North Little

25   Rock and Little Rock.  Are those also offered or stipulated or

1  both?

2      (Defendant's Exhibits 1 and 2 received in evidence.)

3          MS. WILLIAMS:  Stipulated to, Your Honor.

4          THE COURT:  All right.  Then I'll receive those as 3

5  and 4, Defendant's 3 and 4.  3 will be North Little Rock, and 4

6  will be Little Rock, both received by stipulation.  So we've got

7  four exhibits to clear up the facts.

8      (Defendant's Exhibits 3 and 4 received in evidence.)

9          MS. WILLIAMS:  Your Honor, I also have Little Rock's

10  awards and North Little Rock's awards.  We listed it in our

11  response.  So, if you want to look at it, I have them here for

12  you.  And I can make that an exhibit if you want them.

13          THE COURT:  Mr. Kaiser, what's your thought on the

14  record?

15          MR. KAISER:  We would stipulate to those as well.

16          THE COURT:  All right.  I think it might be helpful,

17  Ms. Williams, to have copies of the record.  They will be United

18  States 1 and 2.  Is that correct?

19          MS. WILLIAMS:  Yes, Your Honor.  Little Rock has

20  several, but I'll just make it one exhibit.  It's several pages.

21          THE COURT:  All right.  So USA No. 1 is the Little

22  Rock grants.  That's a composite.  And 2, North Little Rock?

23          MS. WILLIAMS:  Yes, Your Honor.

24          THE COURT:  North Little Rock grants.

25          MS. WILLIAMS:  May I approach?

1          THE COURT:  You may.

2     Mr. Kaiser, the Arkansas State Police material that you

3  sent to chambers was a voluminous annual report.  The Exhibit 1

4  that you've offered looks to be the cover and the key one page.

5  Is that correct?

6          MR. KAISER:  Yes, Your Honor.

7          THE COURT:  And you prefer just those essential pages?

8          MR. KAISER:  Yes, Your Honor.

9          THE COURT:  Good.  Then 2 is the spreadsheet,

10  helpfully readable.  Thank you.  3, as I said, is North Little

11  Rock.  4 is Little Rock.  Then the Government's 1 and 2.

12     All right.  Counsel, y'all know what's on my mind because

13  of the questions asked.  And I appreciated the briefs, but I

14  want to hear, in addition, whatever else it is that you want to

15  argue to the Court and draw my attention to.

16     Mr. Kaiser.

17          MR. KAISER:  Yes, Your Honor.

18     Your Honor, if I may remove my mask to make my argument.

19          THE COURT:  Please do, yes.  That will be clearer for

20  all of us.

21          MR. KAISER:  Judge, this case is important because

22  it's asking where is the line, where is the line between federal

23  and state jurisdiction.  If somebody purchases a private home

24  and gets a Fannie Mae or a Freddie Mac loan, under the

25  government's argument here, the alleged arson of that home

1    privately owned would be a federal crime.

2              THE COURT:  Doesn't it have to be, under the statute's

3    words, an agency or institution, Mr. Kaiser?  Would it count on

4    a private person?

5              MR. KAISER:  Your Honor, under the --

6              THE COURT:  Or an institution or organization.

7              MR. KAISER:  Yes, Your Honor.  But, under the

8    government's reading of the statutes, it would extend even to

9    private entities.  The United States' position would make

10   virtually every crime a federal violation of the federal/state

11   balance.  We essentially wouldn't need state courts.  The United

12   States is dangerously close to arguing that something is federal

13   just because it receives de minimis funding from the federal

14   government.

15             Under the reading necessary to sustain the counts under the

16   government's argument, Section 844(f) would apply to someone who

17   set fire to a football stadium, or even the football jerseys of

18   a college or university that receives small amounts of research

19   funding from the NIH would qualify under this statute.  And we

20   believe a better explanation for why this was charged federally

21   relates to the timing and who my client was rather than the law.

22             Something that I did not see in the Court's order and I did

23   want to raise, just for preservation's sake, we also made a

24   claim regarding the 924 enhancements that 844(f) is not a crime

25   of violence.  It can include arson of one's own property, so it

1    would not be the property of another.  It can also include a

2    recklessness mens rea.  Again, it would not make it a crime of

3    violence.  We would ask the Court in its ultimate ruling, if

4    necessary, if it doesn't dismiss on these other grounds, to

5    reach that point as well.

6         This section that we're arguing about today was passed

7    expressly in response to the burning of an ROTC building at the

8    University of Wisconsin, I believe, at a state university in the

9    Midwest.  It was not some vehicle merely owned by the University

10   of Wisconsin generally.

11        The United States is relying on the *Sabri* case from the

12   Eighth Circuit, but it is readily distinguishable on the facts

13   and on the law.  In that case the Minneapolis association was

14   the local agent for disbursing purely federal money.  So bribing

15   someone in that agency that receives and distributes purely

16   federal money met the statute in that situation.

17        And, as the Court pointed out, the statute at issue there

18   had numerical minimums to establish the nexus to the federal

19   government.  To quote the court there:  "Any concern that we may

20   have had regarding the scope of this law is allayed by the

21   statute itself.  The statute is self-limiting to ensure that

22   federal regulatory power does not tag along after federal money

23   like a hungry dog."  I'm quoting the *Morgan* case.

24   "Section 666(b)," the section at issue in that case, "is a

25   jurisdictional provision that ensures in each particular case

1    that the federal power will be exercised only where the federal

2    government has a substantial interest at stake and where

3    substantial federal funds may be at risk."

4         Clearly, we don't have that here.  We don't have a $10,000

5    threshold requirement as in the statute at issue in *Sabri*.

6    Based on the stipulated exhibits, the North Little Rock Police

7    Department receives roughly one one-thousandth of its annual

8    budget from the federal government.  The Little Rock Police

9    Department receives roughly 1 percent of its annual budget from

10   the federal government, and the Arkansas State Police receives

11   roughly 2 percent of its annual budget from the federal

12   government.  So these are de minimis amounts when we compare

13   them to every other case that has been cited by the Court, by

14   us, by the government.  They pale in comparison.  The

15   Minneapolis association was 100 percent federal money.

16        The special needs school at issue, I believe, in the

17   *Kimberlin* case, 40 percent of the funding for that special needs

18   school, which was made up of a consortium of entities, was

19   federal money.  So this is not a situation of a school receiving

20   40 percent funding from the federal government.  This isn't a

21   Planned Parenthood clinic.  This isn't a local agency that

22   exists solely to distribute federal money.  These are local

23   police cars for local and state police agencies.  Police cars

24   have been burned in this district before, but they have never

25   been charged in federal court or in this manner.

1    Furthermore, the United States, in making their argument
2   that this statute is permissible pursuant to the Necessary and
3   Proper Clause, they haven't specified which constitutional power
4   is actually being channeled through that clause.  In *Brown*, the
5   case cited by the Court, the Court pointed to the Spending
6   Clause, but the United States doesn't seem to take a position
7   here.  So I would ask the United States to specify which portion
8   of the Constitution is being channeled through the Necessary and
9   Proper Clause under their argument.  At the end of their brief,
10  they seem to suggest just the general police power that some
11  federal cases initiate with local agencies.  But, again, I would
12  ask them to specify that because it is unclear from their
13  briefing.
14      Federal jurisdiction is supposed to be based on who the
15  alleged victim or victims is or was or how the alleged crime was
16  committed, not who the defendant is or when they are alleged to
17  have committed their crime.  June of 2020 has long passed.  This
18  is a state case on all the charges.  We would move to dismiss.
19  We appreciate the Court's diligence.
20          THE COURT:  May I interrupt, Mr. Kaiser?
21          MR. KAISER:  Yes, sir.
22          THE COURT:  I know it wasn't in my list of questions
23  or on the agenda, but your bringing up the 924 arguments reminds
24  me that we may need to deal with them as well.  In my mind they
25  were secondary because it depends on the answer to the first

1    question.

2              MR. KAISER:  Yes, Your Honor.

3              THE COURT:  But since I've got you here, would you

4    give me three or four sentences there on what you believe the

5    problems are?

6              MR. KAISER:  So there are multiple problems, Your

7    Honor.  First off, that a recklessness mens rea and malicious

8    intent can be enough to satisfy 844(f), but that would not make

9    it a crime of violence under the statutory definition.

10   Secondly --

11             THE COURT:  Maliciousness isn't recklessness.  Right?

12   It's a higher standard?

13             MR. KAISER:  If Your Honor will give me one moment.

14             THE COURT:  Of course, especially since I'm springing

15   this on you.  As I understood the law there, the problem with

16   recklessness is it is the range of intent that could be

17   captured, whereas maliciousness, I wondered if that had a

18   stronger intentionality to it such that there wasn't the problem

19   in the cases, the same problem as in the cases you relied on.

20             MR. KAISER:  Your Honor, we would just point the Court

21   toward the *Borden* case from the United States Supreme Court

22   cited in our initial motion to dismiss as well as several

23   district court cases construing it to mean that because certain

24   crimes about malicious conduct, like the federal arson statute

25   we're talking about today, cannot qualify as a crime of violence

1    due to the malicious mens rea.  Furthermore, the arson statute

2    as it exists -- and there have been several courts that have

3    affirmed convictions for arson of one's own property, whereas a

4    crime of violence must be committed against another.  So there

5    are multiple grounds to where that enhancement specifically is

6    inappropriate even if the Court finds there is jurisdiction to

7    charge under the federal arson statute in the first place.

8            THE COURT:  Thank you.  I will circle back to those

9    points as needed.

10           MR. KAISER:  Thank you, sir.  That's all I have at

11   this time.

12           THE COURT:  Okay.  Ms. Williams, good morning.

13           MS. WILLIAMS:  Good morning, Your Honor.  I'll start

14   by saying that I think that our briefs are clear on our position

15   and that every issue that Mr. Kaiser raised has been addressed

16   in our briefs.

17        Specifically, when it comes to how the statute was enacted,

18   the United States Supreme Court has said it is not what Congress

19   says it's enacted under, it's what they say it's enacted under.

20   And in this case Congress clearly has an interest in law

21   enforcement, local, state and federal.

22        We have concurrent jurisdiction.  These entities or these

23   organizations or institutions receive federal funding yearly.

24   Every year it's more.  Some of the grants, as you will see, are

25   from the Department of Justice.  And we have concurrent

1    jurisdiction, and we work with these local law enforcement

2    institutions on a daily basis.  So Congress can enact -- can

3    spend its money however it likes under the Spending Clause, and

4    it then can criminalize activity destroying that spending or

5    that property under the Necessary and Proper Clause.  So with

6    those two clauses, the statute is constitutional, and it's

7    constitutional on its face as well.

8                THE COURT:  May I interrupt, Ms. Williams?

9                MS. WILLIAMS:  Yes, Your Honor.

10                THE COURT:  So do you agree that the statute cannot

11    stand under the Property Clause?

12                MS. WILLIAMS:  Could you give me a moment?

13        No, Your Honor, because the first half of the statute falls

14    under the Property Clause.  It's the second half that goes under

15    a different clause, so we can't say that the statute doesn't

16    exist under the Property Clause because part of it is actually

17    protecting federal property.  And then the second half of the

18    statute is what comes into the Spending and Necessary and

19    Proper.

20                THE COURT:  You are right.  My question was imprecise.

21                MS. WILLIAMS:  Okay.

22                THE COURT:  I don't think Mr. Kaiser would dispute

23    that Congress can criminalize the destruction of federal

24    property, period, end of story.  But the addition to the statute

25    that we're talking about here, where Congress acted to

1   criminalize the destruction by arson of property where there's

2   any financial assistance to an organization or institution, it's

3   no longer federal property, is it, once the government gives the

4   money away?

5           MS. WILLIAMS:  Yes, Your Honor.  That's correct.  We

6   believe that under the Spending Clause and the Necessary and

7   Proper Clause that Congress could enact the statute, though.

8           THE COURT:  But you are not pressing the point that

9   under the Property Clause Congress could enact the part of the

10  statute that's in play here.

11          MS. WILLIAMS:  That's correct, Your Honor.

12          THE COURT:  Okay.  And I take your point, and I

13  appreciate counsel confirming the law, that it's not what

14  Congress says what power it's acting under, but rather it's what

15  the Court holds.  See the Affordable Care Act case.  Right?

16      So let's shift to the Spending Clause in combination with

17  the Necessary and Proper Clause.  Is $1 enough to an

18  organization or institution to allow Congress to then

19  criminalize arson of any property owned by that institution or

20  organization?  That's your brother Kaiser's hypothetical about

21  the football jerseys.

22          MS. WILLIAMS:  Your Honor, the United States would not

23  say $1 was enough.  It's not about a dollar amount to the United

24  States.  That's irrelevant completely, the percentage of

25  funding.  It is if Congress is spending its money to further its

1   objectives, and law enforcement is one of those objectives.  And

2   because they are spending money, they can then protect it by

3   criminalizing anyone who tries to destroy it.

4           THE COURT:  I'm trying to understand at a level of

5   principle what's going on here.  I understand the law

6   enforcement.  That's the context, and it's an important context.

7   But the words of the statute don't invoke that context.

8   Instead, they are much more general.  Right?  Financial

9   assistance --

10          MS. WILLIAMS:  Receiving.

11          THE COURT:  Or any institution or organization

12  receiving federal financial assistance, so federal money is

13  omnipresent.  I'll take the pandemic.  I think it's an extreme

14  case.  But the government spent all kinds of money in the

15  pandemic.  I'm sure your office is diligently looking at whether

16  the law was complied with in all of those programs.  Many

17  businesses, many churches, many companies, things that would

18  qualify as institutions or organizations, received federal

19  financial assistance to deal with the pandemic.  If the van of

20  one of those outfits gets burned up, federal crime?

21          MS. WILLIAMS:  Your Honor, I think the way that -- it

22  is the congressional interest.  It's the federal interest that

23  criminalizes this.  I mean, we could go down -- you know, we

24  were trying to think of like a trash can was burned or

25  something.  There's always going to be something that's too

1    broad.  This is the malicious burning of a vehicle or property.

2    The statute specifically lists vehicle of an institution or

3    organization receiving federal funding.  I don't think I'm

4    answering your question.

5         THE COURT:  You are right.  The statute says,

6    "building, vehicle or other personal or real property, in whole

7    or in part, owned or possessed by or leased to the United States

8    or any department or agency thereof."  So far so good.  No

9    problem with that.  Right?  If somebody tries to burn the

10   courthouse, we're in good shape.  They can be charged.  But then

11   the potentially troublesome sentence "or any institution or

12   organization receiving federal financial assistance."  In the

13   case that you leaned heavily on in your hearing brief, Judge

14   Hansen, writing for the Court of Appeals in *Sabri*, emphasized

15   the broadness of this word "any," and we've got it here again.

16        MS. WILLIAMS:  Your Honor, but the difference is the

17   18 U.S.C. 666, it doesn't require a federal nexus.  That's the

18   difference.

19        Your Honor, can I have a moment?

20        Your Honor, this statute, it criminalizes activity that the

21   entity has a federal interest for instrumentality, so something

22   that the federal government wants to -- that the federal

23   government has an interest in protecting.  That's the

24   difference.  You know, we can look at all of these

25   hypotheticals, just like the trash can, if someone accidentally

1    burns a trash can or someone on purpose burns a trash can.  But

2    really what matters is the case that's before the Court now, and

3    the facts of that case actually fit the statute.

4            THE COURT:  So you are drawing me back helpfully to

5    the fact that this is an as-applied challenge.  And your brother

6    Kaiser has done a good job of putting the issue in terms of the

7    stark colors that are clear if we talk about football jerseys or

8    a van from, say, a business that helps disabled children that

9    happens to receive Medicare funding or got a grant during a

10   pandemic.  But you want to pull me back to the fact that we're

11   talking police cars.

12           MS. WILLIAMS:  Yes, Your Honor.  Specifically, these

13   three police cars or two that were actually burned -- the first

14   one, the Molotov cocktail didn't go off.  I mean, if you take it

15   as far as Mr. Kaiser has taken it, if one of these Tasers in the

16   North Little Rock car were actually in the car, in the police

17   car that got burned out, then we would have federal

18   jurisdiction, the way that he's -- well, I don't want to say

19   what he's doing.  But the way I interpret his argument is that

20   we have to -- anytime we start charging a statute, we have to go

21   and take an intricate tracing into what the federal government

22   has paid each entity or each organization before we even charge

23   the statute, like extreme tracing of where the federal funding

24   went exactly.

25           So if the Taser is in the car, then we can charge it?

1    Let's say North Little Rock had a Taser in the car and it got

2    burned up.  We could charge that statute.  But the same

3    defendant is charged in each of these counts in Little Rock,

4    North Little Rock and state police.  So we'll have federal

5    jurisdiction over one but we won't -- we won't take it to the

6    Arkansas State Police, where it was a brand-new car and there

7    was nothing in the vehicle yet.

8         THE COURT:  In your hypothetical, the Taser, having

9    been purchased with a grant, a federal grant, is that the point?

10        MS. WILLIAMS:  Yes, Your Honor.

11        THE COURT:  That, it seems to me, you are emphasizing

12   there the pivot from the Property Clause to the Spending Clause

13   and the Necessary and Proper Clause that you would say

14   eliminates this need for tracing and pulls back to these larger

15   questions of purpose and does the federal government have an

16   interest, is some federal purpose being furthered here.

17        MS. WILLIAMS:  Yes, Your Honor.  Like the football

18   jersey has no federal purpose.

19        THE COURT:  Be careful there.

20        MS. WILLIAMS:  Well, I wouldn't think so.

21        THE COURT:  And I might agree with you, but others

22   might disagree on how important football is.  But I take your

23   point on the distinction there.

24        MS. WILLIAMS:  Do you have more questions for me?

25        THE COURT:  Yes.  I'm just trying to formulate them in

1   an accurate way.  So the United States doesn't dispute the

2   amount of funding that flows, federal funding, that flows to

3   these entities.  Correct?

4        MS. WILLIAMS:  Correct, Your Honor.

5        THE COURT:  And it doesn't dispute that there were no

6   federal dollars that were spent for these three police cars.

7        MS. WILLIAMS:  Correct.

8        THE COURT:  It, instead, steps back into the side and

9   says but there are federal dollars that support law enforcement

10  generally, and because of the state and federal cooperation in

11  law enforcement, therefore it's rational or reasonable for

12  Congress to have criminalized the destruction by arson of any

13  property owned by these entities that are involved in furthering

14  this common interest in law enforcement?

15       MS. WILLIAMS:  That's exactly right, Your Honor.

16       THE COURT:  Fair?

17       MS. WILLIAMS:  Yes.

18       THE COURT:  Does it matter that when we think about

19  arson in general we think about state law property, the police

20  powers of the state, to protect property?  Do you feel that

21  hydraulic pressure of the common law that makes the states

22  primarily responsible for our criminal laws?

23       MS. WILLIAMS:  Yes, Your Honor.  I understand what you

24  are saying.  Federal law criminalizes Molotov cocktails.  These

25  are one case together, you know.  It's not just that he took a

1  lighter and lit a car on fire.  He took a Molotov cocktail,

2  which is a specific federal statute that we, as the federal

3  government, we most of the time prosecute those cases, the

4  Molotov cocktail cases.  And he actually used it to burn the

5  vehicle of an institution receiving federal funding.  So I see

6  what you are saying, the arson.  But the federal government, we

7  prosecute arson as well, like often.

8           THE COURT:  You were just -- as you were speaking, I

9  was calling, I had an arson case recently -- not recently, but

10  within the last year or so.  It involved an apartment complex in

11  Conway.  And I don't recall what the jurisdictional hook was

12  there, but it was certainly prosecuted here.

13           MS. WILLIAMS:  Was it 844(i), Your Honor?

14           THE COURT:  I don't remember.

15           MS. WILLIAMS:  I think that has an interstate commerce

16  section in it, 844(i).

17           THE COURT:  That may have been it.

18        All right.  Thank you, Ms. Williams.  I may call you back.

19           MS. WILLIAMS:  Okay.  Can I have one moment?

20           THE COURT:  Of course.  Yes.  Ms. Williams, it's fine

21  if you want to tag and have one of your colleagues speak.

22           MS. WILLIAMS:  Thank you, Your Honor.  I just wanted

23  to add that, in the legislative history, Congress actually

24  acknowledges that arson is a state crime, but that is why it

25  says that there must be a federal interest.  And that's what

1    we're focused on.  That's what I was trying to say earlier -- I

2    don't think I was very clear on it -- that in the statute there

3    must be a federal interest in the property, and law enforcement

4    is a federal interest.

5              THE COURT:  I understand.  It's just the earlier cases

6    proceeding along the Property Clause analysis dealt with if not

7    the tracing, it was quasi-tracing, you know, how much is the

8    federal funding and did it flow for this particular property.

9    Thank you.

10             MS. WILLIAMS:  Yes, Your Honor.

11             THE COURT:  Mr. Kaiser, now you have your answer on

12   the Spending Clause.  Right?  And the Necessary and Proper

13   Clause.

14             MR. KAISER:  Thank you, Judge.  So the Court asked is

15   $1 enough.  The government evaded the answer but said yes

16   without saying yes, and then argued that there is no need for

17   this tracing.  However, the case they relied on did that

18   tracing.  *Sabri* did that tracing.  The case the Court gave us,

19   *Brown*, did that tracing.  Both of the entities there dealt

20   exclusively with distribution of federal funds, 100 percent

21   federal funds.  Both of the courts in those cases in doing their

22   Necessary and Proper Clause and Spending Clause analysis pointed

23   to that fact.

24        So the Minnesota -- it was a local civic agency through the

25   City of Minneapolis in Minnesota that existed solely to

distribute federal development grants that were going into

various parts of Minneapolis, so the purported arson of a

building associated with that agency which existed solely to

dish out federal money counted; similarly in *Brown*, the Planned

Parenthood clinic, which was, again, 100 percent funded by the

Department of Health, Education and Welfare.  All operating

funds came from that.  The government has no answer for that.

THE COURT:  I thought the Minnesota case was a bribery

case.

MR. KAISER:  Excuse me, Your Honor.  It was a bribery

case with a different statute.  But the way that they found the

federal hook there was that it was a local agency that existed

solely to distribute 100 percent federal development grants.  It

also had the $10,000 hook that the Court specifically pointed to

concerning the concerns about the scope of that law.

And if we had a similar provision in 844(f), perhaps we

would not have as legitimate of a challenge as we do, but there

isn't one.  It is unlimited.

The government's argument is essentially, if we feel like

it, if we can find any money there, we can charge it.  We don't

need to establish a monetary amount or do specific tracing.

But, if we can find anything there, we can charge it.  And

that's what they have done here.  The North Little Rock Police

Department receives one one-thousandth of their funding from the

federal government.  The government's position is that is

1   enough, so they are arguing that there is a minimum.  It may not

2   be the $1 the Court suggested, but it is de minimis by anyone's

3   standard, one one-thousandth, .01 percent.

4              THE COURT:  Does the federal interest that your sister

5   Williams talked about in law enforcement, does that do the work

6   that the dollar amounts do in the bribery cases?

7              MR. KAISER:  Absolutely not.  And *Sabri* has a specific

8   paragraph where it points out where other courts have used the

9   Necessary and Proper or the Spending Clause through the

10  Necessary and Proper Clause to justify application of the

11  statute.  Every one of those was a completely federal or fully

12  funded by federal entity.  If the Court will give me one moment,

13  I have that list pulled up.

14     I apologize.  It's from the *Brown* case, Your Honor.  Other

15  institutions the Court has held to be federal instrumentalities

16  include the Bank of the United States, the Home Owners' Loan

17  Corporation, the United States Spruce Corporation, a wholly

18  owned corporation of the federal government, the federal land

19  banks and national banks, not a local police agency receiving

20  between one one-thousandth and 2 percent of its annual budget

21  from the federal government.  Thank you, sir.

22             THE COURT:  Thank you, Mr. Kaiser.

23     Ms. Williams, anything else from the United States?

24             MS. WILLIAMS:  Just, Your Honor, that we would

25  reiterate that we do not think the percentage is relevant.

1     Again, in 666 it says federal funds.  In 844 it says federal
2     financial assistance.  And these are all real dollars that
3     Congress is giving, one one-hundredth of their budget.  I mean,
4     a police budget is very expensive for a year.  But federal
5     dollars are going -- actual federal dollars are going to further
6     the federal interest of law enforcement yearly.  It's not $1.
7     It's thousands of dollars that the federal government is giving
8     to each agency yearly, and they have an interest in protecting
9     that.
10          THE COURT:  And what is it -- beyond prosecutorial
11    discretion wisely exercised, what is it that provides the line
12    drawing on how much of a federal interest is enough, either
13    financial or in terms of purpose, fulfilling a federal purpose?
14          MS. WILLIAMS:  I really think it is the purpose, Your
15    Honor, the federal purpose behind it, the federal interest.
16    That's what I keep going back to.  I know I've said it a hundred
17    times, and I'm sorry.  You know, saying a dollar amount, because
18    it actually said in 666 there is a fund, $10,000 --
19          THE COURT:  Sure.
20          MS. WILLIAMS:  -- but there's not in this in 844.  And
21    that is because the crime has to be against something that is
22    pushing a federal interest.  And that federal interest is what I
23    guess you would say minimizes or lessens the broadness of the
24    statute.  It's the federal interest that is being protected.
25    Does that make sense?

1      THE COURT:  I understand the point.  I understand the

2  argument.  In a sense, the Property Clause analysis is easier.

3  It's crisper.  Once you move from the Property Clause to the

4  Spending Clause and the Necessary and Proper Clause, the

5  crispness tends to dissipate, and you are driven to this point

6  of effectuating a federal purpose or furthering a federal

7  purpose, and the crispness dissipates.  And your brother Kaiser

8  says follow the money.  Follow the money.  That tells us how

9  important this is or not.  And I certainly understand that

10  argument.  I, likewise, understand yours.  All right.  Thank

11  you.

12      MS. WILLIAMS:  Yes, Your Honor.

13      THE COURT:  Counsel, I appreciate your argument today

14  and clearing up the evidentiary record as well.  You've given me

15  complicated matters to think about here.  Where are we --

16  shifting from those complicated matters to the particulars of

17  the trial, where are we trial-wise?

18      Ms. Williams.

19      MS. WILLIAMS:  Your Honor, I believe Ms. Nowlin

20  intends on filing a motion to continue, I believe, today.

21      THE COURT:  Okay.  I see.  I think I'm scheduled to

22  consider a proposed plea from another co-defendant later today.

23  And I believe I received a plea from one co-defendant a month or

24  two ago.  I forget how many folks we have involved.  Of course,

25  we have Mr. Lung'aho.  Are there any others, or is that the

1   slate?

2           MS. WILLIAMS:  That's all of them, Your Honor, five.

3           THE COURT:  So your thought is the motion for

4   continuance is coming.  The Court will smile on that, give it

5   time to file an order on this, and then we'll see where things

6   stand.

7           MS. WILLIAMS:  That's what I'm hoping for, Your Honor.

8           THE COURT:  Mr. Kaiser, what is your thought on

9   trial-related issues?

10          MR. KAISER:  Your Honor, I need to visit with my

11  client about that.

12          THE COURT:  I'm sorry?

13          MR. KAISER:  I need to visit with my client about

14  that.  Obviously, this ruling has changed everything about the

15  way we've been dealing with this case, so it's kind of essential

16  for us to make that call.

17          THE COURT:  Absolutely.  And it's, alas, not something

18  I can sort from the bench today.  Then, as you helpfully

19  reminded me, there are the 924 issues behind this one depending

20  upon how I come out.  And I need to perhaps wrestle with the

21  malice point.

22      All right.  It does not look like that we are going to

23  trial then next week as scheduled.  I'll await this motion.

24  When I rule on that, as counsel anticipate, I need time to chew

25  through these issues and resolve the important legal issues that

1    are presented here in Mr. Lung'aho's motion.  So we'll find a

2    date sooner rather than later that gives me time to rule and the

3    parties to react to that ruling and gives Ms. Nowlin,

4    co-defendant Nowlin, time to finish plea negotiations and decide

5    whether she wants to go to trial.

6         All right.  Mr. Kaiser, anything else?

7              MR. KAISER:  Judge, I'm just going to quote the

8    government's argument that there's always going to be something

9    that is too broad.  We agree.  This is that case.

10             THE COURT:  Since you asked, let me follow up with a

11   question that I intended to ask and didn't.  The challenge that

12   you make strikes me as not a facial challenge.  It's an

13   as-applied challenge.

14             MR. KAISER:  Yes, Your Honor.

15             THE COURT:  Right.  Understood.  As I said, I think,

16   if the alleged arson had involved a federal agency or perhaps

17   even, following the lines of your argument, Mr. Kaiser, if it

18   involved some agency or institution that was clearly an arm of

19   the United States, funded either entirely or predominantly with

20   federal money, perhaps no constitutional issue presented, but

21   not our situation here with these three police cars that

22   belonged to agencies that receive federal financial assistance

23   but in small portions and in ways that aren't directly related

24   to the police cars, thus presenting the harder question of does

25   our statute apply in those circumstances where it's alleged that

1    Mr. Lung'aho and others burned the cars, or attempted to, with

2    the Molotov cocktails.

3        You make, Ms. Williams, an interesting point on the other

4    side about the destructive device issue, the firearm issue.  I

5    guess it's a destructive device rather than firearm.  Right?

6            MS. WILLIAMS:  Yes, Your Honor.

7            THE COURT:  I guess good old-fashioned arson with some

8    gasoline and a match might be a different situation.

9        Good.  Counsel, I appreciate your work.  The Court couldn't

10   do its job without the help of good lawyers, and I have that

11   here.  And I thank you.  We'll be in recess.  I'll look for that

12   motion.

13           MR. WHITE:  Your Honor, I apologize.  I know you

14   invited us to jump in.  Anyway, Mr. Kaiser's last comment made

15   me want to say this to the Court.  Maybe I should get to the

16   microphone.

17           THE COURT:  The court reporter would thank you,

18   although we generally don't have trouble hearing you, Mr. White.

19           MR. WHITE:  Well, I just was thinking about the

20   overbreadth thing.  There's a part of the Supreme Court's

21   opinion in *Sabri* at 541 U.S. 600, from 609 to 610, where the

22   Court is just talking about the constitutional challenge to 666

23   in that instance.  But it makes this comment that "Facial

24   challenges of this sort are especially to be discouraged.  Not

25   only do they invite judgments on poor records," which,

1  obviously, we tried to develop the facts in this case, "but they
2  entail a further departure from the norms of adjudication in
3  federal courts.  Overbreadth challenges call for relaxing
4  familiar requirements of standing to allow a determination that
5  the law would be unconstitutionally applied to different parties
6  and different circumstances from those at hand."  And it goes on
7  to say:  "Accordingly, we have recognized a validity of facial
8  attacks alleging overbreadth, though not necessarily using that
9  term, in relatively few settings and generally on the strength
10  of specific reasons weighty enough to overcome our well-founded
11  reticence."

12      In that opinion, the Court, when it was analyzing the
13  constitutional issues, really spent a fair amount of time
14  talking about the Spending and Necessary and Proper Clause and
15  the rational basis for Congress' exercise of its authority.  I
16  just felt like maybe that language gives a little different
17  answer to Mr. Kaiser's overbreadth argument.

18          THE COURT:  So a word or two about that.  That's one
19  of the reasons why I circled back and pressed Mr. Kaiser on
20  whether he is making a facial challenge, because in both *Brown*
21  and *Sabri,* the challenges were straight up this statute is
22  unconstitutional.  But here Mr. Lung'aho I don't think is saying
23  that.  I think he is arguing that this statute is
24  unconstitutional as applied to him on our specific facts.

25      I need to spend more time with the background, obviously.

1    I'm not sure it's a true overbreadth challenge, which is Justice

2    Souter's skepticism, speaking for the court, is patent in that

3    opinion.  Right?  That's a nuclear weapon.  I don't think we

4    have a nuclear bomb in the case.  Do you disagree with any of

5    that.

6             MR. WHITE:  I don't disagree, Your Honor.  I would say

7    that even the Supreme Court itself kind of goes back and forth

8    sometimes on how to characterize an as applied or a facial

9    challenge.  And in this case, as much as the defendant says that

10   it's an as-applied challenge, it's really more of an esoteric

11   challenge.  It's a hypothetical challenge, if it's only a little

12   bit, and the facts in this case are there actually were

13   significant federal dollars spent to each of these three

14   agencies.  So it's really more of a but that's not enough.

15   That's not enough money.

16        So, to me, it kind of bridges both of those challenges

17   because the facts of this case actually include a bunch of money

18   from the federal government going to these institutions or

19   organizations for a federal purpose.  So to say that it's as

20   applied, then you would have to say $265,000 isn't enough, not

21   generally one one-hundredth or 1 percent is not enough.  That

22   seems to go from as applied to a facial challenge to me.  That's

23   why I think the Supreme Court has a parenthetical in it, like

24   what I just read, where it said:  "We recognize the validity of

25   facial attacks alleging overbreadth," then open paren, "though

1   not necessarily using that term," close paren, because it's just

2   not always crystal clear, and I think in this case it's not

3   crystal clear.

4           THE COURT:  Thank you, Mr. White.

5       Mr. Kaiser, you are the movant.  Did you have a last word

6   in response?

7           MR. KAISER:  No, sir.

8       Your Honor, the only thing I would ask is that my client

9   remain in Pulaski County until that trial date is resolved.  If

10  we do end up going to trial on that date, I would just ask that

11  he be in Pulaski County for purpose of potential negotiations

12  and preparation.

13          THE COURT:  Understood.  I think it's quite unlikely

14  that we're going to trial on Monday given the complexity of

15  these issues that I have to resolve and what I understand to be

16  the imminent motion for a continuance by a co-defendant.  I

17  would say that until the trial setting is changed, though, I

18  don't know why the marshal would relocate Mr. Lung'aho because,

19  as things now stand, we have our trial setting.

20          MR. KAISER:  Yes.

21          THE COURT:  On Monday.

22          MR. KAISER:  Yes, sir.

23          THE COURT:  Good.  We're in recess.

24      (Proceedings concluded at 10:10 a.m.)

25                      REPORTER'S CERTIFICATE

Elaine Hinson, RMR, CRR, CCR, United States Court Reporter
elaine_hinson@ared.uscourts.gov (501) 604-5155

1      I certify that the foregoing is a correct transcript from
2  the record of proceedings in the above-entitled matter.

3  /s/Elaine Hinson, RMR, CRR, CCR      Date:  November 1, 2022.
4  United States Court Reporter